# In the United States Court of Federal Claims

**OFFICE OF SPECIAL MASTERS**
Filed: January 24, 2020

| | | |
|---|---|---|
| * * * * * * * * * * * * * | | |
| ANA SEVERINO, | * | UNPUBLISHED |
| | * | |
| | * | |
| Petitioner, | * | No. 18-09V |
| | * | |
| v. | * | Special Master Gowen |
| | * | |
| SECRETARY OF HEALTH | * | Tetanus-diphtheria-pertussis |
| AND HUMAN SERVICES, | * | ("Tdap"); Shoulder Injury Related |
| | * | to Vaccine Administration |
| Respondent. | * | ("SIRVA"); Fact Ruling. |
| * * * * * * * * * * * * * | | |

*Shealene P. Mancuso,* Muller Brazil, LLP, Dresher, PA, for petitioner.
*Lisa A. Watts,* Department of Justice, Washington, D.C., for respondent.

## FINDING OF FACTS[1]

On January 2, 2018, Ana Severino ("petitioner") filed a petition under the National Vaccine Injury Compensation Program (the "Vaccine Act" or the "Vaccine Program").[2] Petitioner alleges that she received a tetanus-diphtheria-pertussis ("Tdap") vaccine on January 20, 2015, which was the actual cause of her developing a Shoulder Injury Related to Vaccine Administration ("SIRVA"). Petition at Preamble (ECF No. 1).

After carefully considering the testimony, the medical records and affidavits filed in this case, I find that petitioner's left shoulder pain began within 48 hours of her vaccination and her injury continued for a period of six-months or more.

---

[1] Pursuant to the E-Government Act of 2002, *see* 44 U.S.C. §3501 note (2012), **because this ruling contains a reasoned explanation for the action in this case, I intend to post it on the website of the United States Court of Federal Claims.** The court's website is at http://www.uscfc.uscourts.gov/aggregator/sources/7. Before the ruling is posted on the court's website, each party has 14 days to file a motion requesting redaction "of any information furnished by that party: (1) that is a trade secret or commercial or financial in substance and is privileged or confidential; or (2) that includes medical files or similar files, the disclosure of which would constitute a clearly unwarranted invasion of privacy." Vaccine Rule 18(b). "An objecting party must provide the court with a proposed redacted version of the decision." *Id.* **If neither party files a motion for redaction within 14 days, the ruling will be posted on the court's website without any changes.** *Id.*

[2] The National Vaccine Injury Compensation Program is set forth in Part 2 of the National Childhood Vaccine Injury Act of 1986, Pub. L. No. 99-660, 100 Stat. 3755, codified as amended, 42 U.S.C. §§ 300aa-10 to 34 (2012). All citations in this decision to individual sections of the Vaccine Act are to 42 U.S.C. § 300aa.

## I.      Procedural History

On January 2, 2018, petitioner filed a petition in the Vaccine program, alleging that as a result of receiving a Tdap vaccination on January 20, 2015, she suffered a SIRVA.  Petition at Preamble.  The case was assigned to the Special Processing Unit ("SPU") for consideration.

On October 19, 2018, respondent filed a status report indicating that he would like to defend against the claim and file a Rule 4(c) report.  Status Report (ECF No. 14).  Respondent filed his Rule 4(c) report on December 21, 2018, recommending against compensation. Respondent ("Resp.") Report (ECF No. 15).

Respondent specifically objected to compensation stating that petitioner has failed to meet the Qualifications and Aids to Interpretation ("QAI") criteria for a SIRVA.  Resp. Report at 4.  Respondent stated that the symptoms petitioner reported in temporal proximity to vaccination were of a localized skin reaction that resolved within weeks.  *Id.*  Additionally, respondent stated, "those symptoms do not meet the QAI for SIRVA."  *Id.*  Respondent also stated that petitioner first presented to an orthopedist for left shoulder complaints in November 2016, almost two years after vaccine administration and that the medical records do not support the onset of shoulder adhesive capsulitis in a temporal proximity to the vaccination at issue.  *Id.* at 5.  (She did have several calls and visits to her primary care physician both in the immediate aftermath of the vaccination and in November 2015.)

The case was reassigned to my docket on February 26, 2019.  Notice of Reassignment (ECF No. 17).  I held a status conference on March 12, 2019.  During the status conference, respondent raised the issue of onset of petitioner's alleged SIRVA injury.  Scheduling Order at 1 (ECF No. 19).  Petitioner acknowledged a gap in treatment and explained that due to the nature of her occupation as a tax accountant and that her son was involved in a serious trampoline accident, she was unable to seek medical treatment for her left shoulder for a significant period of time.  *Id.*  Petitioner was ordered to file additional affidavits and other documentation to support her statements.  *Id.* at 2.

On March 13, 2019, petitioner filed her son's medical records, emails between her primary care providers and receipts for pain relieving ointment.  Petitioner Exhibits ("Pet. Ex.") 4-6.  On April 1, 2019, petitioner filed an updated affidavit, an affidavit from her colleague, Mr. William Penney and an affidavit from her husband, Mr. Juan Severino.  Pet. Exs. 7, 8 and 10.

Respondent filed a status report on May 16, 2019 stating that he maintains his litigative position and believes that additional development is necessary to further develop the record. Status Report (ECF No. 23).

A fact hearing was set for December 3, 2019 in Boston, Massachusetts.  Hearing Order (ECF No. 26).  On December 4, 2019, via video teleconference, a fact hearing was held to determine onset of petitioner's pain in her left shoulder and if her injury continued for a period of six-months or more, as required by the Vaccine Act.  *See* §300aa-11(c)(1)(D).  Petitioner, Mr. William Penney and Mr. Juan Severino testified regarding the onset of petitioner's alleged injury.

This matter is now ripe for adjudication.

## II.     Legal Standards Regarding Fact Finding

The process for making determinations in Vaccine Program cases regarding factual issues begins with consideration of the medical records, which are required to be filed with the petition. §11(c)(2).  The Federal Circuit has made clear that medical records "warrant consideration as trustworthy evidence."  *Cucuras v. Sec'y of Health & Human Servs.*, 993 F.2d at 1528.  Medical records that are created contemporaneously with the events they describe are presumed to be accurate and "complete" (i.e., presenting all relevant information on a patient's health problems). *Cucuras*, 993 F.2d at 1528.

Accordingly, where medical records are clear, consistent, and complete, they should be afforded substantial weight.  *Lowrie v. Sec'y of Health & Human Servs.*, No. 03-1585V, 2005 WL 6117475, at *20 (Fed. Cl. Spec. Mstr. Dec. 12, 2005).  However, this rule does not always apply.  In *Lowrie*, the special master wrote that "written records which are, themselves, inconsistent, should be accorded less deference than those which are internally consistent." *Lowrie*, at *19.

The Court of Federal Claims has recognized that "medical records may be incomplete or inaccurate."  *Camery v. Sec'y of Health & Human Servs.*, 42 Fed. Cl. 381, 391 (1998).  The Court later outlined four possible explanations for inconsistencies between contemporaneously created medical records and later testimony: (1) a person's failure to recount to the medical professional everything that happened during the relevant time period; (2) the medical professional's failure to document everything reported to her or him; (3) a person's faulty recollection of the events when presenting testimony; or (4) a person's purposeful recounting of symptoms that did not exist.  *La Londe v. Sec'y of Health & Human Servs.*, 110 Fed. Cl. 184, 203-04 (2013), *aff'd*, 746 F.3d 1335 (Fed. Cir. 2014).

The Court has also said that medical records may be outweighed by testimony that is given later in time that is "consistent, clear, cogent, and compelling."  *Camery*, 42 Fed. Cl. at 391 (*citing Blutstein v. Sec'y of Health & Human Servs.*, No. 90-2808, 1998 WL 408611, at *5 (Fed. Cl. Spec. Mstr. June 30, 1998).  The credibility of the individual offering such testimony must also be determined.  *Andreu v. Sec'y of Health & Human Servs.*, 569 F.3d 1367, 1379 (Fed. Cir. 2009); *Bradley v. Sec'y of Health & Human Servs.*, 991 F.2d 1570, 1575 (Fed. Cir. 1993).

The special master is obligated to fully consider and compare the medical records, testimony, and all other "relevant and reliable evidence contained in the record."  *La Londe*, 110 Fed. Cl. at 204 (citing § 12(d)(3); Vaccine Rule 8); *see also Burns v. Sec'y of Health & Human Servs.*, 3 F.3d 415, 417 (Fed. Cir. 1993) (holding that it is within the special master's discretion to determine whether to afford greater weight to medical records or to other evidence, such as oral testimony surrounding the events in question that was given at a later date, provided that such determination is rational).

III.   **Summary of Evidence Submitted**

a.   **Medical Records**

On January 20, 2015, petitioner received the Tdap vaccination from her primary care physician.  Pet. Ex. 1 at 2-15.  Three days later, petitioner called her primary care provider ("PCP"), stating she had symptoms of "erythema, edema, warmth to touch at Tdap injection site," and that the area of erythema and edema was increasing in size and "tender to palpitations."  Pet. Ex. 2 at 282.  Later that day, petitioner returned to her PCP for an evaluation of her left shoulder.  *Id.* at 127. The progress note from the appointment states that "[patient] presents with area of warmth, edema, and erythema over left deltoid where she had tdap injection 3 days ago.  She reports symptoms began yesterday.  She denies f/c/sweats, arm pain."  *Id.* at 128.  Petitioner was diagnosed with a local skin infection and given a prescription of antibiotics. *Id.*  On January 26, 2015, petitioner called her PCP back and reported a "possible reaction to medication."  *Id.* at 130.

On January 29, 2015, petitioner called her treating physician's office to explain that she had some improvement in her symptoms, but continued to have some pain.  *Id.* at 134.  Petitioner returned to her primary care physician on February 6, 2015 for a follow-up appointment to check her blood pressure.  *Id.* at 136.

On March 10, 2015, petitioner's PCP called her to remind her about pre-visit labs and left petitioner a voicemail.  *Id.* at 139.  Petitioner returned the call on March 24, 2015 and informed her PCP that her "son just had surgery so things have been crazy and will come in soon."  *Id.* at 140.

On November 24, 2015, petitioner presented to her PCP's office complaining of left arm pain with an onset of January 2015.  Pet. Ex. 2 at 155.  In the progress notes section, Dr. Patty Yoffe wrote, "[Petitioner] had a TDAP done in 1/2015 and had a local reaction afterwards with redness, pain, and swelling.  She has continued to have pain in the arm in the area of the shot when lifting arm, sleeping on that side or reaching behind her."  *Id.* at 156. A physical exam revealed petitioner had increased pain with resisted internal and external rotation and abduction, but demonstrated normal range of motion.  *Id.* at 156.

On November 17, 2016, petitioner was diagnosed with adhesive capsulitis of the left shoulder.  Pet. Ex. 2 at 202.  The progress note states, "This 51-year old comes in now with a history of left shoulder discomfort and decreased motion.  She states this has been going on for a few months now."  *Id.* at 203.  Petitioner pointed to the deltoid "as the point of maximal tenderness."  *Id.*  A physical exam revealed petitioner had decreased range of motion on forward flexion, abduction, external rotation and internal rotation.  *Id.*  Additionally, on passive movement the examiner was "unable to externally rotate her more than 10 degrees or abduct her more than 90 degrees."  *Id.*  It was recommended that she received a cortisone steroid injection. *Id.* at 203.

On December 1, 2016, petitioner emailed PA-C McCarthy stating that the location he suggested she receive the cortisone shot did not have any appointments until the end of the

month. *Id.* at 212. PA-C McCarthy responded that he could give petitioner an injection the following day. *Id.* at 213.

Petitioner returned PA-C McCarthy on December 9, 2016 for a follow-up for her adhesive capsulitis of her left shoulder. Pet. Ex. 2 at 224. A physical exam showed petitioner continued to have pain to palpation over her left deltoid and anterior glenohumeral joint. *Id.* at 225. PA-C McCarthy noted that he was unable to externally rotate her shoulder more than 5-10 degrees passively. *Id.* Petitioner maintained the diagnosis of left shoulder adhesive capsulitis. *Id.* Petitioner received a subacromial cortisone injection. *Id.*

Petitioner returned to PA-C McCarthy on January 26, 2017 for a follow-up for her left shoulder adhesive capsulitis. *Id.* at 230. Petitioner reported she was performing her home exercises and making some improvements, but her shoulder is not back to where it was before "it started to freeze." *Id.* PA-C McCarthy assessed her with left shoulder adhesive capsulitis and recommended fluoroscopically guided injection into her glenohumeral joint. *Id.* at 231.

On February 8, 2017, petitioner had a fluoroscopically guided cortisone injection. *Id.* at 237. Petitioner reported to PA-C McCarthy on March 28, 2017 that her pain has diminished and motion has improved somewhat due to injection. *Id.* at 238. The physical exam of her left shoulder showed that she still only had ten degrees of external rotation, but increased movement in her forward flexion and abduction. *Id.*

### b. Affidavits

Petitioner filed a supplemental affidavit on April 1, 2019. Pet. Ex. 10. Petitioner explained that she received the vaccination in her upper arm and the "shot really stung," and, "It felt like someone had punched my arm." Pet. Ex. 10 ¶ 3. She stated that, "By the next day, my arm became red and swollen. I even called the clinic and they told me that it would go away on its own. When it didn't, I went in for an appointment on the 23rd and they [prescribed] the antibiotic. Within the first two days following my vaccination, I was having trouble lifting my arm." *Id.* Petitioner stated that the redness and swelling eventually resolved, however, "the pain and difficulties with moving my shoulder and arm were still there." *Id.* at ¶ 4.

Petitioner also explained that she delayed treatment for her shoulder following the vaccination because she is an accountant and tax season had just begun in February. *Id.* at 7. Additionally, she stated that her son suffered a severe trampoline fall on March 12, 2015 and was focused on his recovery. *Id.* at ¶ 8. She also stated that she continued to use home remedies, like pain creams and pain medication to manage her shoulder pain, believing it would resolve on its own. *Id.* at ¶ 9.

Mr. William Penney, a colleague of the petitioner provided an affidavit discussing the relevant time period. Pet. Ex. 8. He stated that he has worked with petitioner for thirty years and sees her daily. *Id.* at ¶ 2. He stated that petitioner "complained of arm pain to me the day of or the day after her vaccination, since her arm got red and swollen, which she showed me." *Id.* at ¶ 5. He stated that petitioner asked him for help to carry folders because of her shoulder and arm pain. *Id.* Mr. Penney also stated that he remembered her office "always smelled like some

kind of Ben Gay," and that petitioner stated she would go see a doctor after tax season. *Id.* at ¶ 6. He stated that her son had an accident which required months of therapy. *Id.* at ¶ 7. The accident overwhelmed the petitioner, but she continued to complain of arm and shoulder pain. *Id.*

Mr. Juan Severino, petitioner's husband, also provided an affidavit regarding the onset of petitioner's shoulder injury.

### c.  Testimony at the Hearing

Petitioner stated that prior to receiving the Tdap vaccination on January 20, 2015, she had never experienced any issues with her left shoulder or arm. Tr. 6. Petitioner testified that her doctor administered the vaccine in her left arm, approximately four inches from the top of her left arm. Tr. 7. She explained it felt as if someone had "punched her," but went back to work within the half hour. Tr. 8.

When she went back to her office, petitioner told her colleague, Mr. William Penney, about her doctor's appointment and that left her arm hurt. Tr. 8. Petitioner stated that she took Advil and put Vicks Vapor Rub on her arm when she returned home that evening. Tr. 9. She explained to her husband that her left shoulder hurt her since she received the vaccination earlier that day and could not sleep on her left side that evening. Tr. 11. Petitioner stated that she called her doctor's office the next day and told the nurse that her arm "really hurts" and that it was red and getting swollen. *Id.* She explained that the nurse told her to wait it out and that "usually people have that kind of reaction." *Id.* Petitioner stated that she was trying not to use her arm because it hurt and was having difficulty dressing. Tr. 12. She stated that she asked her husband for help at home getting dressed. *Id.*

On January 23, 2015, three days after receiving the Tdap vaccine, petitioner returned to her doctor's office as the pain, redness and swelling at the injection site did not go away. Tr. 15. Petitioner stated that the nurse who examined her prescribed an antibiotic and told her to take Advil as necessary. Tr. 16. Petitioner returned to her doctor on February 6, 2015 and told the examining physician that she was experiencing pain in her left shoulder, but petitioner did not remember the doctor recording any of her issues at the time. Tr. 19. Petitioner testified that the doctor did not seem concerned about the left shoulder pain. Tr. 18.

When asked why petitioner had a ten-month gap in treatment for her shoulder, petitioner explained that she is a tax accountant and it was tax season. Tr. 20. She testified that during tax season, which lasts from approximately February 1 to April 15, she works up to sixty hours a week. Tr. 21. Normally, she works a forty-hour work week. *Id.* Petitioner explained that nothing else is done, only tax work during tax season. Tr. 20.

Then, in March 2015, her son had a serious accident at a trampoline park which broke his leg. *Id.* Once he returned home to recover, petitioner and her husband, moved their son into the living room to avoid the stairs. Tr. 24. Petitioner testified that both her and her husband slept in the living room with him, to assist him if he needed anything in the night. Tr. 23-24. Initially,

her son had physical therapy at the house, but then he had physical therapy three times a week at a different facility.  Tr. 24.

Petitioner stated that during this time she was only focused on her son's recovery and work.  Tr. 25.  She testified that she was overwhelmed during this period of time and she thought that her shoulder pain would resolve on its own.  Tr. 29.

By November 16, 2015, the pain in her left shoulder had persisted.  Tr. 31.  Petitioner testified that she was still having difficulty dressing herself and shaving.  Tr. 32.  Petitioner saw her physician on November 24, 2015 for a follow-up on her left shoulder pain and updated lab testing.  Tr. 32; *see also* Pet. Ex. 2 at 156.

Petitioner testified that she did not seek additional treatment for her shoulder until November 2016 because she was dealing with a lot of things, including her son and work.  Tr. 34-35.  But during this time, she continued to have pain and issues reaching behind her back.  Tr. 35.  When she finally saw a specialist in November 2016, this was the first time she had been diagnosed with frozen shoulder.  Tr. 33.  She received a steroid injection for pain.  *Id.*  Petitioner testified that the first steroid injection did not help her.  Tr. 36.  She stated that the second injection she received that was "more involved" helped for approximately three weeks, however, she did not want to continue with the injections.  *Id.*

Petitioner testified that her orthopedist told her that her last option is to have surgery, which she has declined.  Tr. 38.  She stated that she continues to experience some difficulties in utilizing her left arm when reaching behind her back, however, her pain has decreased.  Tr. 37.

Mr. William Penney, the petitioner's colleague of thirty years, testified the petitioner never had difficulty using her left arm prior to January 2015.  Tr. 61.  He explained that he interacts with the petitioner approximately three to four times a day and eats lunch with her and others every week.  Tr. 60.

He testified that when the petitioner returned from her physical where she received the Tdap vaccination, she showed him her left arm.  Tr. 62.  Mr. Penney stated it was red and puffy.  *Id.*  He explained that petitioner had to roll up her sleeve to show him where she received the injection.  Tr. 71.  When asked if he remembered when she received the vaccine in question, he recalled that it was before her son's trampoline accident in 2015.  Tr. 63.

Mr. Penney testified that after the vaccine he noticed her having difficulty putting on her coat.  Tr. 64.  He stated that he noticed her having "trouble getting one arm into the sleeve."  *Id.*  He also testified that the petitioner was using Bengay during this time period because he remembered the smell.  Tr. 65.  He stated that prior to the vaccine the petitioner did not use Ben Gay or anything that smelled like that, but after the injection he said it smell like Bengay, "Just about every time I came in."  *Id.*

Mr. Juan Severino, the petitioner's husband, testified that after petitioner received the vaccination she was in a lot of pain.  Tr. 74.  He stated that prior to receiving the Tdap vaccine,

the petitioner never had any difficulty using her left arm.  *Id.*  Mr. Severino demonstrated that petitioner could not raise her arm more than approximately 120 degrees.  Tr. 74.

He explained that after the vaccination the petitioner had difficulty dressing and reaching behind her back, so he would assist her.  Tr. 76.  He stated that she stopped sleeping on her left side because of her arm pain.  Tr. 77.

Mr. Severino also testified that petitioner delayed treatment of her should pain because of their son's trampoline accident.  Tr. 78.

### IV.    Finding of Fact

There are two factual issues to be determined after the hearing: the date of onset of petitioner's left shoulder pain and whether her injury continued for six-months or longer.

#### a.   Onset

The petitioner, Mr. Penney and Mr. Severino all testified credibly that petitioner experienced pain in left shoulder almost immediately after receiving the Tdap vaccine on January 20, 2015.  Their testimonies provided additional detail as to petitioner's pain as she experienced immediately or soon after she received the Tdap vaccination on January 20, 2015.  Petitioner herself stated that her pain began immediately after receiving the vaccine and when she returned to her office, she informed her colleague Mr. William Penney about the pain, redness and swelling in her left shoulder at the injection site.  Mr. Penney recounted that he remembered the petitioner showing him her arm the same day and observed that it was red and swollen.  Mr. Severino testified that it was only after petitioner received the vaccine that she experienced difficulty dressing and sleeping on her left side.  He testified that he never had to help her dress prior to petitioner receiving the Tdap vaccination.

Further, the petitioner's medical records include internal inconsistencies written by different treating nurses and physicians.  For example, three days after receiving the vaccine, petitioner called her PCP and Nurse Michaela recorded that she was experiencing "erythema, edema, and warmth to touch at Tdap injection site."  Pet. Ex. 2 at 282.  During this call, petitioner also reported the area was tender to palpation.  *Id.*  However, when she saw Nurse Practitioner Herron the same day, it was recorded that the injection site was not tender to the touch.  *Id.* at 127.  On January 29, 2015, when petitioner called her primary care physician's office and spoke to Nurse Riesenburger, it was recorded that petitioner had "some improvement in her symptoms in her affected *hand* for which she's taking Monodox[3] 100 mg BID x 7 days, but *continued* to have some pain."  *Id.* at 134 (emphasis added).  At the time the petitioner was using the antibiotics for the skin injection in her left arm, not for her hand.  Additionally, this record indicates that petitioner's pain, which was inconsistently recorded in earlier appointments, began prior to the January 29, 2015 phone call.

---

[3] Monodox is doxycycline, a semisynthetic broad-spectrum antibacterial of the tetacycline group; administered orally.  *Dorland's Illustrated Medical Dictionary 32nd Ed.* (2012) at 565.

After review of the records, affidavits and particularly the live testimony of the petitioner and the witnesses, I found that the petitioner's contention that her shoulder pain began on the day of vaccination credible and well supported by the testimony of Mr. Penney and of her husband, Juan Severino.  Therefore, I find that the onset of petitioner's left shoulder pain began immediately after she received the Tdap vaccination on January 20, 2015.

### b.  Six-Month Severity

Respondent stated that, "There is no evidence that petitioner's reaction persisted for more than six months after vaccine administration.  Therefore, petitioner's localized skin reaction does not meet the six-month severity requirement under the Vaccine Act."  Resp. Report at 4.  As stated above, I found that the onset of petitioner's arm pain began immediately after the January 20, 2015 Tdap vaccination.  Additionally, the medical records and the testimony establish that petitioner's arm pain continued for more than six months.

On November 16, 2015, petitioner emailed her primary care physician, Dr. Yoffe and reported that she has had pain in her left arm that began "since I had the vaccination for the tetanus in January."  Pet. Ex. 2 at 286.  On November 24, 2015, petitioner was seen by Dr. Yoffe, the primary reason being "Left upper arm pain," and "Reaction to DTaP Immunization, sequela."  *Id.* at 155.  Dr. Yoffe noted that petitioner "continued to have pain in the arm in the area of the shot when lifting arm, sleeping on that side or reaching behind her."  *Id.* at 156.  After a physical exam, Dr. Yoffe observed, "She has increased pain with resisted [internal] rotation and [external] rotation and abduction on exam."  *Id.* at 156.

The witnesses credibly described how petitioner experienced pain and reduced range of motion in her left arm for a period of six months or more and why she delayed treatment.  She explained that after receiving the vaccination, she was having difficulty dressing, like putting her shirt and coat on.  Tr. 13.  She stated that she "tried not to use it because it hurt."  *Id.*  Petitioner also demonstrated she could only lift her arm to about shoulder height (or 90 degrees) because of the pain, but she "didn't try to lift it because it hurt."  *Id.*  Eventually, petitioner had limited the use of her should so much that she was diagnosed with adhesive capsulitis, or "frozen shoulder," in the fall of 2016.  *See* Pet. Ex. 2 at 203.

Mr. William Penney testified that he had to assist the petitioner in carrying folders while at work.  Tr. 64.  He also observed that the petitioner had attempted to treat her shoulder pain with Bengay.  Tr. 65.  He explained that her office smelled of Bengay after she received the vaccine and he had never smelled anything like that prior to her receiving the vaccine.  Tr. 65.

All three of the witnesses also explained that in March 2015, petitioner's son had a terrible trampoline accident for which further delayed her treatment of her shoulder.  This testimony was confirmed by medical records of her son.  Additionally, petitioner's occupation as a tax accountant required her to work longer hours beginning in February, which unfortunately, began only two weeks after she received the vaccination. The longer hours spent by tax accountants between February and April 15th is a well-known busy time for this profession, which required the petitioner to work an additional twenty hours a week.  I find the petitioner's

reasons for delaying treatment while experiencing ongoing shoulder pain and impaired mobility in the arm to be credible.

Further, I find that the petitioner experienced shoulder pain and reduced range of motion following the Tdap vaccination she received on January 20, 2015 for a period of six-months or longer and that her ongoing symptoms and disability related to the left shoulder were consistently and credibly explained by the petitioner and the witnesses.

## V.    Conclusion

I have carefully reviewed the record, including the affidavits, testimony, medical records and the Respondent's Rule 4(c) report. I find that petitioner began to experience shoulder pain immediately after the January 20, 2015 vaccination and that her pain and reduced range of motion continued for a period of six-months or more. I find that petitioner's delay in follow-up treatment from medical professionals while experiencing continued pain and disability to be reasonably explained.

The parties are encouraged to resolve the remain of this case informally. If the parties retain any experts to opine about causation, the parties must deliver this Ruling Finding Facts to the proposed expert. *See Burns v. Sec'y of Health & Human Servs.,* 3 F.3d 415 (Fed. Cir. 1993).

Therefore, in accordance with the above, the following is hereby **ORDERED**:

1) **Within thirty (30) days, by Monday, February 24, 2020**, petitioner shall forward a demand for settlement to the respondent and file a status report indicating completion.

2) **Thirty days thereafter,** respondent shall file a status report reporting on the progress of settlement discussions or indicate if he intends to continue to defend against this claim.

**IT IS SO ORDERED.**

<u>s/Thomas L. Gowen</u>
Thomas L. Gowen
Special Master